[Sac. No. 7742.   In Bank.   Apr. 21, 1967.]

EUNICE D. CLARK, Plaintiff and Respondent, v. HAROLD M. GIBBONS et al., Defendants and Appellants.

Peart, Baraty & Hassard, Wilke, Fleury & Sapunor, Richard G. Logan, Hanna & Brophy, Donald R. Brophy and Eugene A. Biglow for Defendants and Appellants.

Jack H. Werchick and Arne Werchick for Plaintiff and Respondent.

PETERS, J.—Plaintiff Eunice D. Clark brought this action against Dr. Selmants, an anesthesiologist, Dr. Gibbons and his partner Dr. Horn, orthopedic surgeons, and Sutter Community Hospital of Sacramento for damages for injuries resulting from an operation allegedly negligently performed in Sutter Community Hospital by Drs. Gibbons and Selmants. The jury returned verdicts of $27,500 against all of the doctors and exonerated the hospital.[1] Motions for a new trial were denied, and the doctors have appealed from the judgment.

Defendants' contentions are that the verdicts are not supported by sufficient evidence of negligence, and that the trial court committed reversible error by giving conditional res ipsa loquitur instructions. Both contentions are unsound.

It must be kept in mind that in determining whether sufficient evidence of negligence was adduced against the doctors,[2] the power of an appellate court begins and ends with a finding that the record contains some substantial evidence, contradicted or uncontradicted, which supports the conclusion reached by the jury. The record must be read in the light most advantageous to the plaintiff. All conflicts must be resolved in her favor; and all legitimate and reasonable inferences must be indulged in to uphold the verdict, if that is possible. (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].)

The record discloses that on October 30, 1960, at approximately 2 p.m., plaintiff Eunice Clark, who was 41 years old, obese and in good health, suffered a fractured right ankle when she slipped and fell on a waxed floor in her home. She was taken by ambulance to the Sutter Community Hospital and examined by her physician Dr. Smith. After viewing X-rays of the fracture, Dr. Smith told her that it was a case for an orthopedic surgeon. Mrs. Clark requested the services of Dr. Gibbons who had previously treated her husband and who

---

[1]The liability of Dr. Horn was predicated upon his partnership with Dr. Gibbons. No separate contentions are made as to his liability. It is, in effect, admitted that Dr. Horn's liability depends upon that of Dr. Gibbons. Plaintiff has not appealed from the judgment in favor of the hospital.

[2]Plaintiff did not produce any expert witnesses of her own. For expert testimony she relied upon the evidence of the defendants called under section 2055 of the Code of Civil Procedure.

happened to be in the hospital at that time. Dr. Gibbons determined from viewing the X-rays that plaintiff had a severe trimalleolar fracture of the right ankle and that an open reduction, i.e., reduction by surgery, should be performed as soon as possible. He informed plaintiff that he would prefer to operate that night since the ankle would be stiff by the next morning. Plaintiff agreed.

Dr. Selmants, one of the anesthesiologists on the hospital staff, undertook to administer the anesthesia. Plaintiff gave the doctor a preanesthesia history which revealed that she had eaten between 1 and 2 p.m. Dr. Selmants believed that a general anesthetic should not be given to one who had eaten in the 12 hours preceding surgery, and that a general anesthetic was dangerous for a patient who had eaten within six or seven hours of surgery. Dr. Selmants concluded that plaintiff was not a safe subject for a general anesthetic. He told plaintiff that she should be given a spinal anesthetic, and she agreed to a spinal, although she said that she would prefer a general. Dr. Gibbons concurred in the decision to give a spinal.

Dr. Selmants selected the agent to be used for the spinal. He testified that it was the anesthesiolgist's duty to know the time required for surgery and that he did not ask Dr. Gibbons how long the operation would take, because he knew from previously working with Dr. Gibbons that the surgeon averaged two hours for usual reductions of this kind. This case was not unusual, he believed, and would accordingly require two hours. The agent that Dr. Selmants chose was 10 milligrams of pontocaine. It was designed to maintain a level of T-10 for two hours plus or minus 15 minutes, and it was predictable in intensity and duration.

Dr. Gibbons testified that plaintiff's fracture was severe, and that he expected the operation to take from two to three hours. The anesthesiologist said that the anesthesia he selected could not be used unmodified for surgery of from two and a half to three hours, but that by adding epinephine to the pontocaine, he could have produced an agent with a predictable duration of over four and a half hours.

Prior to surgery plaintiff was nervous and anxious. She was not more upset however than any person with an ankle injury and she was calmed by injections of vistaril and nembutal and taken into surgery at approximately 8 p.m.

Dr. Selmants then administered the spinal anesthetic and made pinprick tests to assure that the proper level of anesthesia had been achieved. After the anesthesia was injected

and the numbness started up her legs, plaintiff felt that she could not breathe and her voice became squeaky. Dr. Selmants stated that a patient should not suffer from shortness of breath at a level of T-10, and that plaintiff's difficulty in breathing could have been "some undue effect [from] the way the anesthetic was given."

When the anesthesia reached the level necessary for surgery, Dr. Gibbons commenced the operation. The level of anesthesia remained adequate at first; but after about one hour the doctors noticed from plaintiff's unconscious movements that the anesthesia was beginning to wear off. At this point Dr. Gibbons had completed all of the reduction except for reduction of the posterior fragment of the tibia. Dr. Selmants believed that 20 minutes more were needed to complete the operation, but Dr. Gibbons testified that no less than another hour would have been required.

Dr. Selmants could have extended the surgical anesthesia without harm to the patient. He stated that intravenous demerol could have been used for that purpose and that there was no particular reason not to use it, although the extension obtained might still have been insufficient to complete the operation. Also, another spinal could have been given. Dr. Gibbons stated that he did not think that plaintiff "would have been up to" another spinal and that in turning her for the spinal all the prepping and draping would have to be undone and this might subject her to a risk of infection.

In any event, the operation was terminated, the incision was closed, and a cast was applied to plaintiff's ankle in an attempt to reduce the posterior fragment by external pressure. Dr. Gibbons' operative report mentioned that the operation was not completed because the anesthetic did not last for the required length of time. Dr. Selmants failed to note those facts, although he was supposed to make an accurate report of how the anesthesia proceeded with relation to the needs of the operation.

The decision to terminate surgery was made primarily by Dr. Gibbons. He was in control of the surgery and could have asked for an extension of the anesthesia. He had stated in his deposition that he became upset when the anesthesia began to wear off and that he did not consult with Dr. Selmants about extending the anesthesia but just said "I think we will quit for tonight and do this another time." At the trial, however, both he and Dr. Selmants testified that they discussed the question whether the anesthesia should be continued or the

operation terminated and that Dr. Selmants agreed with the decision to terminate.

Dr. Gibbons testified that, when he made the decision to terminate, he expected to complete the operation later, but did not do so because blebs, infected blisters of the skin, developed; that it was very common for blebs to accompany an injury of this nature, that plaintiff's blebs healed at the normal rate, but that healing of blebs at the normal rate did not permit a second operation within the time when a second operation would have been of any value.

Three days after the operation Dr. Gibbons noticed that the posterior fragment had slipped back to some extent and that another open reduction was required. A second operation could not be performed, however, because pressure and resultant swelling, as pointed out, had caused blebs, which presented a serious risk of infection if the skin were cut.

Dr. Gibbons charged plaintiff less than the normal operating fee because his operation was unsuccessful. She now suffers from osteoarthritis in the ankle joint, which is painful. The arthritis might have resulted from the fracture even if a perfect union had been achieved. However, there is expert testimony that the chances of getting arthritis were increased by the failure to achieve a complete reduction; and the defendants do not claim that the evidence is insufficient to show that the arthritis was due, at least in part, to the failure to complete the operation.

Nothing but a fusion, which would impair the ankle's up and down movement, could now give plaintiff a pain free ankle. Dr. Gibbons' partner, Dr. Horn, offered to fuse the ankle for a token fee of $100.

Plaintiff's position is that the jury received sufficient evidence to find that the imperfect reduction causing the present injury was the result of (1) the negligence of Dr. Selmants in selecting and administering an anesthetic which wore off before the operation was completed and (2) the negligence of Dr. Gibbons in (a) not informing Dr. Selmants that the operation might well take longer than the two hours which Selmants expected the operation to take and (b) terminating the operation prematurely rather than ordering an extension of the anesthesia.

The evidence upon which plaintiff primarily relies to show negligence in the selection or administration of the anesthetic is the following testimony of Dr. Selmants: "Q. . . . if proper care is used, in the usual course of events, anesthetics

like this don't run out or wear out, do they—surgical anesthetics? A. No, sir.

. . . . . . . . . . . . .

And I said 'no, sir.' What I mean is, they can. There is no control. There is—there is—there is a variable, as anything else we do in medicine. There is nothing exact that guarantees this will happen, this will not happen, how long this will last. You cannot ever predicate what you're doing on the basis that it's going to be 100 percent; you have a certain area of predictability, and that's what you go on. Q. Now, my question was—you see, you misunderstood. I'll say it again. My question was, if proper care is used in a situation like this, anesthetics like this usually do not run out, do they? A. Yes, usually they do not run out.'' Dr. Gibbons stated in his deposition that if the anesthesiologist uses proper care and obtains proper information about the case, he can make a spinal anesthesia last long enough for an operation of this kind.

Later in direct examination Dr. Selmants and Dr. Horn testified that it is common knowledge in the field of anesthesia that there is always an inherent risk that, even when due care is used, a spinal anesthesia will not last as long as contemplated. Dr. Selmants explained that immediately upon the injection of any spinal anesthetizing agent a process of detoxification commences within the area of the nerve root blockage which ultimately causes the anesthesia to wear off. The speed of detoxification in any individual depends primarily upon the amount of circulation in the nerve area and the amount of myelin covering the nerve itself.

▮▮ The evidence, independently of the doctrine of res ipsa loquitur, is sufficient to support the verdict against both doctors. So far as Dr. Selmants is concerned, while the evidence shows that he and Dr. Gibbons were not negligent in making the initial decision to give a spinal rather than a general anesthetic,[3] there is evidence that Dr. Selmants was negligent in selecting the agent to be used for the spinal. The orthopedic surgeon expected the operation would take from two to three hours to complete. Anesthetics were available that would have lasted at least that long without undue danger to the patient. Dr. Selmants did not use those anes-

---

[3] Even if the jury could find that a spinal was not absolutely necessary for the plaintiff's safety, there is no evidence that a general was necessarily preferable in this case. The mere giving of a spinal whenever the patient is experiencing the normal agitation due to an injury is certainly not sufficient to constitute negligence.

thetics because he did not expect that the operation would take as long as three hours. Dr. Selmants admitted, however, that it was his responsibility to know the needs of the surgeon and that he did not inquire how long the surgeon would take in this case. Because he underestimated the probable length of the operation, he gave an anesthetic which was designed to last a maximum of two hours and 15 minutes and a minimum of one hour and 45 minutes. The jury could have found that this choice of anesthetic was negligent.

In addition, Dr. Selmants testified that anesthetics do not usually wear off prematurely if proper care is used. Premature termination can be caused by improper administration of the agent, and plaintiff's initial reaction to the injection, her squeaky voice and difficulty in breathing, is evidence that the anesthetic was improperly administered. Dr. Selmants failed to note the premature termination in his records relating to the progress of the anesthesia, as he should have done. The jury could infer from such omission that he possessed some guilty knowledge regarding the termination. From the symptoms of improper administration and the inference of guilty knowledge, the jury could properly imply that Dr. Selmants had administered the anesthetic improperly.

Although Dr. Selmants testified that inadequate anesthesia could have resulted from several unpredictable causes and that he used due care in the administration of the anesthetic, the credibility of this testimony was properly left to the jury.

There is also sufficient evidence of negligence to support the verdict against Dr. Gibbons. Dr. Gibbons could have been found responsible for the improper selection of an anesthetic. Although the anesthesiologist ordinarily has the duty to ask the surgeon about the projected length of the operation, Dr. Selmants testified that the surgeon should speak to the anesthesiologist if the operation is going to be unusually long. Dr. Selmants testified that Dr. Gibbons averaged two hours in operating on trimalleolar ankle fractures. Dr. Gibbons testified that Mrs. Clark's fracture was one of the most severe trimalleolars he had ever seen. Under those circumstances the jury could find that Dr. Gibbons expected an unusually long operation and was under a duty to warn Dr. Selmants of the need for an anesthetic that would last more than two hours.

Dr. Gibbons stated in his deposition that he became upset when the anesthesia began to wear off and, without consulting

Dr. Selmants about the possibility of extending the anesthesia, said that the surgery would be terminated now and completed at a later time. He also admitted that healing of the skin at the normal rate did not permit a second operation to be performed within the necessary time.

Thus, from Dr. Gibbons' own statements, the jury could have found that in making the decision to terminate he acted rashly knowing the dangers, but without considering the possibility of extending the anesthesia and under the erroneous belief that the completion of the reduction could be accomplished by a second operation. Both the possibility of extending anesthesia and the possibility of further surgery are clearly major factors which should have been considered by a surgeon confronted with inadequate anesthesia. Under these circumstances, the jury could conclude without any other expert testimony that in making the decision to terminate surgery, Dr. Gibbons did not exercise that care and skill ordinarily practiced by other specialists in orthopedic surgery under similar circumstances.[4]

In addition, the facts of this case warrant the use of the conditional res ipsa loquitur instructions. ▮ As a general rule, res ipsa loquitur applies where the occurrence of the injury is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both on common knowledge and on expert testimony. (*Davis* v. *Memorial Hospital,* 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561] ; *Siverson* v. *Weber,* 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97].)

---

[4]This court has held in one case that since a physician normally undertakes to exercise only that care and skill common to the profession and that since some mistakes are inherent in this exercise, proof of mistaken diagnosis or wrong method of treatment in itself is not sufficient to show lack of skill and care. (*Patterson* v. *Marcus,* 203 Cal. 550, 552-553 [265 P. 222].) However, as noted by Prosser, "Such decisions, together with the notorious unwillingness of members of the medical profession to testify against one another, may impose an insuperable handicap upon a plaintiff who cannot obtain the proof." (Prosser on Torts (3d ed. 1964) § 39, p. 231.) Each case must be determined on its own facts, and at least where, as here, there is evidence not only of improper treatment, but of the doctor's agitation and total failure to consider the alternative methods of treatment and their consequences, a jury is competent to find without the conclusion of an expert that the doctor did not exercise that degree of care and skill common to other specialists in the community. (Cf. *Quintal* v. *Laurel Grove Hospital,* 62 Cal.2d 154, 161 [41 Cal.Rptr. 577, 397 P.2d 161].)

■ The doctrine of res ipsa loquitur is a doctrine fundamentally predicated upon inferences deducible from circumstantial evidence and the weight to be given to them. (*Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 163.) As stated in *Fowler* v. *Seaton,* 61 Cal.2d 681, 686-687 [39 Cal. Rptr. 881, 394 P.2d 697] :

''One of the frequently quoted statements of the applicable rules is to be found in the opinion of Chief Justice Erle in *Scott* v. *London & St. Katherine Docks Co.* (1865) 3 H. & C. 596, quoted in Prosser on Torts (2d ed. 1955) section 42, at page 201, as follows: 'There must be reasonable evidence of negligence; but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care.'

''Of course, negligence and connecting defendant with it, like other facts, can be proved by circumstantial evidence. There does not have to be an eyewitness, nor need there be direct evidence of defendant's conduct. There is no absolute requirement that the plaintiff explain how the accident happened. Res ipsa loquitur may apply where the cause of the injury is a mystery, if there is a reasonable and logical inference that defendant was negligent, and that such negligence caused the injury. (Prosser on Torts, *supra,* at p. 204.)'' (See also *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 164-165.)

More than 20 years ago in *Ybarra* v. *Spangard,* 25 Cal.2d 486, 489 et seq. [154 P.2d 687, 162 A.L.R. 1258], this court had occasion to consider the application of the doctrine to cases where injury was received by a medical patient while unconscious under the influence of anesthesia. It was stated:

''There is, however, some uncertainty as to the extent to which res ipsa loquitur may be invoked in cases of injury from medical treatment. This is in part due to the tendency, in some decisions, to lay undue emphasis on the limitations of the doctrine, and to give too little attention to its basic underlying purpose. The result has been that a simple, understandable rule of circumstantial evidence, with a sound background of common sense and human experience, has occasionally been transformed into a rigid legal formula, which arbitrarily precludes its application in many cases

where it is most important that it should be applied. If the doctrine is to continue to serve a useful purpose, we should not forget that 'the particular force and justice of the rule, regarded as a presumption throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person.' . . .

". . . [I]t is difficult to see how the doctrine can, with any justification, be so restricted in its statement as to become inapplicable to a patient who submits himself to the care and custody of doctors and nurses, is rendered unconscious, and receives some injury from instrumentalities used in his treatment. Without the aid of the doctrine a patient who received permanent injuries of a serious character, obviously the result of someone's negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability. (See *Maki* v. *Murray Hospital*, 91 Mont. 251 [7 P.2d 228].) If this were the state of the law of negligence, the courts, to avoid gross injustice, would be forced to invoke the principles of absolute liability, irrespective of negligence, in actions by persons suffering injuries during the course of treatment under anesthesia. But we think this juncture has not yet been reached, and that the doctrine of res ipsa loquitur is properly applicable to the case before us." (*Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 489-491.)

In *Ybarra,* it was pointed out that in a modern hospital a patient is quite likely to come under the care of a number of persons in different types of contractual relationships with each other, including physicians and surgeons, anesthetists, and nurses; that every defendant in whose custody the plaintiff was placed for any period was bound to exercise ordinary care to see that no unnecessary harm came to the plaintiff; that, although at the trial some of the defendants might be found liable and others absolved, this would not preclude application of the doctrine; and that, since each of the defendants in acting together to provide the medical treatment at one time or another was in control of the various agencies which might have harmed plaintiff, they should have the burden of initial explanation. (25 Cal.2d at pp. 491-492.)

*Ybarra* involved an injury which may not have been received during the operation, but *Leonard* v. *Watsonville*

*Community Hospital,* 47 Cal.2d 509, 514 et seq. [305 P.2d 36], involved an injury during the operation and followed *Ybarra* in holding that where the conditions of the doctrine are satisfied all persons who had any control over the patient's body or the instrumentalities causing injury may properly be called upon to meet the inference of negligence by giving an explanation of their conduct. In *Leonard* it was further held that the inference of negligence arising under the doctrine is dispelled as a matter of law with regard to a particular doctor only where other evidence establishes as a matter of law that he is free from negligence. The evidence establishing the absence of negligence in such a case must be clear, positive, uncontradicted and of such a nature that it cannot be rationally disbelieved.

*Ybarra* and *Leonard* establish that, if the conditions giving rise to the doctrine are present when the medical personnel are treated as a group acting in concert and they collectively have access to the chief evidence as to the cause of the injury but the plaintiff does not, a single doctor may not escape the inference as a matter of law merely by showing that as to him alone it is more probable than not that he was free from fault. The basis of the application of the doctrine to all defendants in the cases is that the medical personnel acted as a group and that collectively, without regard to what any one may individually know, or did, they are in a position to explain the cause and produce the chief evidence bearing on the question whereas the plaintiff is not. ██ To avoid the inference *as a matter of law* an individual doctor must go beyond showing that it was unlikely or not probable he was negligent and must establish that he is free from negligence by evidence which cannot be rationally disbelieved. Falling short of such a showing, it remains for the jury to determine whether the inference arising from the doctrine has been rebutted as to any particular doctor.

██ The fact that the patient may have received a local anesthetic rather than a general anesthetic does not eliminate the duty of explanation of those who had control over the procedure where the chief evidence as to the cause is accessible to them but not to the plaintiff. The plaintiff's lack of knowledge may exist not only where he is totally unconscious but also where he is partially unconscious and largely, if not entirely, unaware of what the medical personnel are doing.

The conditions giving rise to the doctrine here existed. This problem was recently discussed in *Quintal* v. *Laurel Grove*

*Hospital, supra,* 62 Cal.2d 154, a case involving injuries during an operation. There the plaintiff suffered a cardiac arrest during the administration of a general anesthetic, and it was held that an instruction on conditional res ipsa loquitur was proper even though the medical experts testified that a cardiac arrest, although a rare occurrence, is a known and calculated risk in the giving of a general anesthetic and though there was no expert testimony that when cardiac arrests do occur, they are more likely than not the result of negligence. There was evidence that a method of meeting the unusual risk existed. Experts testified that when due care is used, cardiac arrests do not ordinarily occur, and, in addition, evidence was presented of fever and apprehension of the patient before administration of the anesthetic which tended to show that the cardiac arrest in that case was caused by negligence of the doctors.

Thus, we recognized in *Quintal* that proof that when due care is exercised an injury rarely occurs, accompanied by other evidence indicating negligence, may be sufficient to warrant an instruction on conditional res ipsa loquitur. (See also *Ragusano* v. *Civic Center Hospital Foundation,* 199 Cal.App.2d 586, 593-594 [19 Cal.Rptr. 118].) This is particularly true where, as in *Quintal* and in the present case, the injury occurred as the result of a normal procedure such as the administration of an anesthetic, rather than from a complex operation.

It is true that evidence that an accident rarely occurs when due care is used does not without more indicate that a particular occurrence is more likely than not the result of someone's negligence. (*Siverson* v. *Weber, supra,* 57 Cal.2d 834, 839.) In *Siverson* it was stated:

"To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible." (57 Cal.2d at p. 839.) But in *Siverson* there was no evidence of a negligent act of a type that could have caused the accident, and none of the

witnesses "testified that anything was done during the operation which was contrary to good medical practice." (57 Cal.2d at pp. 838-839.) The court refused to permit an instruction on the doctrine where the only basis for it was evidence that the injury suffered by the patient rarely occurs as a result of the surgical procedure.

The likelihood of a negligent cause is increased if the low incidence of accidents when due care is used is combined with proof of specific acts of negligence of a type which could have caused the occurrence complained of. When those two facts are proved, the likelihood of a negligent cause may be sufficiently great that the jury may properly conclude that the accident was more probably than not the result of someone's negligence.

That a doctor has done a negligent act of a type that could have caused the accident, which does not ordinarily occur in the exercise of due care, greatly increases the probability that it was his negligence that caused the plaintiff's injury. Thus, the low incidence of accidents when due care is used plus negligent conduct of a type which could have caused the occurrence may make it probable that the occurrence was the result of someone's negligence and that the defendant is probably the person who was responsible. Those are the requirements for applying res ipsa loquitur.

The administration of an anesthetic is now a normal and tested procedure. Dr. Selmants stated that one of the reasons for selecting pontocaine in the instant case was its predictability as to duration. Medical experts testified that spinal anesthetics do not usually run out prematurely if proper care is used, and in explanation of this conclusion, Dr. Selmants stated only that the predictability of such anesthetics was not 100 percent. Dr. Gibbons stated in his deposition without qualification that if an anesthesiologist uses proper care and obtains proper information about the case, he can make a spinal anesthesia last long enough for an operation of this kind.

There is evidence that the injury here was caused by the anesthesia wearing off prematurely and that Dr. Selmants was responsible for selecting and administering an anesthetic which would be adequate for the length of surgery required. Dr. Selmants testified that he did not consult with the surgeon regarding the length of the operation and that he used an anesthetic which, according to the testimony of the surgeon, was inadequate for the estimated length of the oper-

ation. In addition, Dr. Selmants stated that plaintiff's unusual reaction to the anesthetic could have been caused by "some undue effect the way the anesthetic had been given."

There is also evidence, as we have seen, from which the jury could conclude that Dr. Gibbons in the exercise of due care should have advised Dr. Selmants of the anticipated extraordinary length of the surgery and that the former acted rashly in determining to terminate the surgery. It bears emphasis in this connection that the doctors were aware that the procedure should be performed and completed as soon as possible.

This evidence, taken as a whole, along with the evidence that there was a reasonable method of handling the risk when it occurred is certainly sufficient for the jury to find that the injury was probably the result of negligence of someone and that the defendants were probably the persons responsible.

Accordingly we conclude that it was proper to instruct the jury on the doctrine of res ipsa loquitur. It is not claimed that the form of the conditional instructions given was improper.

The judgment is affirmed.

Mosk, J., Burke, J., and Peek, J.,* concurred.

TOBRINER, J.—I concur in the judgment, but I am unable to join either the majority opinion or the opinion of the Chief Justice. I propose here to explain my dissatisfaction with the present definition and application of the doctrine of res ipsa loquitur in that limited number of cases in which rare and inexplicable accidents occur in the operating room. In pursuing the laudable goal of shifting the losses occasioned by such accidents to the parties best able to protect against them through insurance, we have imposed the onus of negligence and malpractice upon capable and dedicated members of the medical profession, burdening the law of res ipsa loquitur with a sweep that is inaccurate, inefficient, and inequitable. I propose a redefinition of the doctrine governing these cases which seems to me more candid, more certain, and more consistent with our underlying objectives.

Initially, I set forth my reasons for joining the majority in affirming the judgments against both defendants. Given the evidence from which the jury could have found that the

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

specific acts and omissions alleged by plaintiff were negligent and proximately caused her injury, I am unwilling to assume that the verdict against the defendants rested upon the trial court's instruction on res ipsa loquitur. Although I believe that the instruction should not have been given under the circumstances of this case, I would hold that the defendants waived any right to demand a new trial on that ground when they failed to request a special verdict to reveal the theory upon which the jury found them liable. (Code Civ. Proc., § 625.)[1]

I cannot agree, however, with the route by which the majority reaches its result. As the Chief Justice demonstrates in his separate opinion herein, neither common knowledge nor expert testimony supported an inference in this case that accidents such as befell the plaintiff ordinarily bespeak a negligent cause.[2] To give a res ipsa instruction under such

---

[1] An appellate court should not disturb a general verdict merely because the trial court gave the jury an abstractly correct instruction which the facts before it did not warrant, provided that *another* theory on which the case was submitted to the jury finds substantial support in the evidence and is unaffected by error. (See *Estate of Hellier* (1914) 169 Cal. 77, 83 [145 P. 1008]; *Posz* v. *Burchell* (1962) 209 Cal.App.2d 324, 335-337 [25 Cal.Rptr. 896], and cases there cited; see also *Tucker* v. *Landucci* (1962) 57 Cal.2d 762, 766 [22 Cal.Rptr. 10, 371 P.2d 754]; *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 368-369 [317 P.2d 601]; *Edwards* v. *Gullick* (1931) 213 Cal. 86, 88 [1 P.2d 11]; *Verdelli* v. *Gray's Harbor etc. Co.* (1896) 115 Cal. 517, 525 [47 P. 364, 778]; *Crosett* v. *Whelan* (1872) 44 Cal. 200, 203; *Moss* v. *Coca Cola Bottling Co.* (1951) 103 Cal. App.2d 380, 384-385 [229 P.2d 802]; *Shields* v. *Oxnard Harbor Dist.* (1941) 46 Cal.App.2d 477, 491 [116 P.2d 121] (McComb, J.); *Hume* v. *Fresno Irr. Dist.* (1937) 21 Cal.App.2d 348, 356-357 [69 P.2d 483]; cf. *Gordon* v. *Aztec Brewing Co.* (1949) 33 Cal.2d 514, 520 [203 P.2d 522]; *Blanton* v. *Curry* (1942) 20 Cal.2d 793, 799-800 [129 P.2d 1] (per curiam); *Gerdes* v. *Pacific Gas & Electric Co.* (1933) 219 Cal. 459, 471-473 [27 P.2d 365, 90 A.L.R. 1071]; *Christensen* v. *Malkin* (1965) 236 Cal.App.2d 114, 123 [45 Cal.Rptr. 836]; *Rather* v. *City & County of San Francisco* (1947) 81 Cal.App.2d 625, 636 [184 P.2d 727].) Although our courts have not always taken this approach (see, e.g., *Burks* v. *Blackman* (1959) 52 Cal.2d 715, 719 [344 P.2d 301]; *Edwards* v. *Freeman* (1949) 34 Cal.2d 589, 594 [212 P.2d 883]; *Huebotter* v. *Follett* (1946) 27 Cal.2d 765, 770-771 [167 P.2d 193]; *Oettinger* v. *Stewart* (1944) 24 Cal.2d 133, 139-140 [148 P.2d 19, 156 A.L.R. 1221]; *Christensen* v. *Bocian* (1959) 169 Cal.App.2d 223 [336 P.2d 1018]; *Schaffer* v. *Claremont Country Club* (1959) 168 Cal.App.2d 351, 358 [336 P.2d 254, 337 P.2d 139], reh. den. 168 Cal.App.2d 358-359), consistent adherence to the rule stated herein would prevent needless appeals and retrials without injustice to either party.

[2] Plaintiff adduced expert testimony to show that, when due care is used, premature termination of anesthetic is rare. The record contains no evidence, however, indicating that in those rare cases in which an anesthetic *does* terminate prematurely, a negligent cause is *more probable* than a non-negligent one. Although plaintiff presented evidence of specific

circumstances invites a purely speculative leap and entrusts the jury with unreviewable power to impose or withhold liability as it sees fit. If public policy demands that defendants be held responsible for unexplained accidents without a reasoned finding of fault, such responsibility should be fixed openly and uniformly, not under the guise of negligence and at the discretion of a jury. (Cf. *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 463 [150 P.2d 436] (Traynor, J., concurring).)

I am likewise disturbed by the conclusion of the Chief Justice that the victims of accidents which do not truly "speak for themselves" should be required to present evidence that the kinds of accidents they suffered are ordinarily caused by negligence. Even if expert medical testimony were readily available to plaintiffs in malpractice cases,[3] such a rule would unfairly penalize the surgical patient who is

---

negligent acts which *could* have caused premature termination, such evidence provided no rational basis for a conclusion that, of the various possible causes, a negligent one was *probably* responsible.

The majority asserts: "[I]f the low incidence of accidents when due care is used is combined with proof of specific acts of negligence of a type which could have caused the occurrence complained of. . . . the jury may properly conclude that the accident was more probably than not the result of someone's negligence." (*Ante*, p. 413.) I cannot agree.

Suppose, for example, that in 5 percent of all operations in which due care is used, a certain spinal anesthetic inevitably terminates prematurely because of an undetectable excess of myelin on the patient's nerves; suppose further that a specific technique for administering the anesthetic does not alter the likelihood of premature termination in patients with an excess of myelin but creates a 2 percent risk of premature termination in normal patients, whereas another available technique, equally desirable in all other relevant respects, creates only a 1 percent risk of premature termination in normal patients. Under these circumstances, the technique which creates twice as high a risk in normal patients and yields no compensating benefit would presumably be considered negligent.

If one were to examine 100 operations in which this negligent technique had been employed, one would expect to find 2 operations in which such negligence caused premature termination, compared with 5 in which an overabundance of myelin caused premature termination. Yet, in every one of these hypothetical operations, the majority would invite the jury to infer a negligent cause without further guidance from the evidence before it; I find it disturbing to note that in 5 out of every 7 cases of premature termination coupled with a specific negligent act, this inference would blame the doctor for an accident he did not cause.

[3]The strong reluctance of doctors to testify against each other has frequently been noted (see, e.g., *Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 484 [234 P.2d 34, 29 A.L.R.2d 425] (Carter, J., dissenting); Belli *An Ancient Therapy Still Applied*: *The Silent Medical Treatment* (1956) 1 Vill.L.Rev. 250, 259) and numerous corrective measures have been suggested (see, e.g., Note, *Malpractice and Medical Testimony* (1963) 77 Harv.L.Rev. 333, 338-350), but the problem apparently remains (see Note. *Medical Malpractice — Expert Testimony* (1966) 60 Nw.U.L.Rev. 834, 835 837).

injured by an accident of a type too rare or too little understood to permit meaningful statistic analysis of its probable cause.[4] Although I agree with the Chief Justice that the above requirement for application of the res ipsa doctrine follows from its basic premises, I submit that use of the doctrine itself fails to serve the ends of justice in cases such as this. Indeed, even the expanded version of res ipsa loquitur espoused by the majority falls considerably short of truly protecting the victims of unfamiliar and unexplained surgical mishaps, since the majority would deny plaintiffs the benefit of a res ipsa instruction unless they could produce the kind of testimony which the Chief Justice would require, or could persuade a medical expert to characterize as substandard the conduct of those entrusted with their care.[5]

Upon reexamining what seem to me the grave shortcomings of these varying formulations of res ipsa loquitur in surgical accident cases, I have concluded that the basic error lies in primary reliance upon the concept of *negligence* and that the courts should undertake a fundamental reassessment of the largely fictitious and often futile search for fault which presently characterizes medical injury litigation of the kind here involved.

At the outset we must recognize that, in the present state of medical knowledge, risks which even the most cautious physician could not have prevented may lead to accidents which even the most expert cannot explain. Although the vast majority of medical practitioners are protected financially by

---

[4]Since the accidents with which we are here concerned by hypothesis occur rarely, there is little hope of obtaining broadly based statistics of the sort hypothesized for the computations in footnote 2, *supra.* The complexity of the concept of negligence as applied to medical techniques, coupled with the difficulties of determining the cause of the few accidents which might be included in any purported sample, render suspect the claim of any expert who asserts that in a representative group of cases he was able to determine the relative proportion of negligent and nonnegligent causes.

[5]The majority reaffirms the holding of *Siverson* v. *Weber* (1962) 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97], that rarity alone does not warrant a conditional res ipsa instruction, and limits the holding of *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 164-166 [41 Cal. Rptr. 577, 397 P.2d 161], to cases in which rarity is coupled with ''proof of specific acts of negligence of a type which could have caused the occurrence complained of.'' (*Ante,* p. 413.) Plaintiffs who cannot qualify under *Quintal* by obtaining such proof are thus relegated to the basic rule of *Siverson* that res ipsa is applicable only if common knowledge or expert witnesses establish that accidents of the sort which befell the plaintiff are ''more likely the result of negligence than some cause for which the defendant is not responsible.'' (57 Cal.2d at 839.)

liability insurance covering such accidents,[6] and although doctors and hospitals can readily transfer the cost of this insurance protection to their patients through higher medical fees, no technique yet devised can protect a doctor from the devastating impact which an adjudication of malpractice can have upon his professional standing.[7] Fearing that his competence may thus be impugned whenever he adopts a procedure difficult to justify to a lay jury, a surgeon may feel compelled to forego an unorthodox technique in order to protect his reputation from ruin.[8] Any system which thus diverts the doctor's attention from the operating room to the courtroom leaves much to be desired.[9]

In light of the expansion of res ipsa loquitur undertaken by such decisions as *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, and by the majority opinion in the present case, there can be little doubt that the net effect of the doctrine is to shift from plaintiffs to defendants the cost of a certain number of unexplainable accidents in which no meaningful basis exists for finding the defendants at fault.[10] Thus the

[6]A 1959 estimate showed that more than 92 percent of American doctors carried professional liability insurance, with an average coverage ranging from $25,000 for general practitioners to $100,000 for specialists. (Silverman, *Medicine's Legal Nightmare,* Saturday Evening Post, April 25, 1959, pp. 36, 120.)

[7]Indeed, many doctors genuinely fear that even if they win a malpractice case, they will be ''all but destroyed professionally.'' (Shindell, *Medicine versus Law: A Proposal for Settlement* (1953) 151 A.M.A.J. 1078, 1079.)

[8]See Cohn, *Medical Malpractice Litigation: A Plague on Both Houses* (1966) 52 A.B.A.J. 32; McCoid, *The Care Required of Medical Practitioners* (1959) 12 Vand.L.Rev. 549, 608; Silverman, *op. cit. supra,* April 11, 1959, p. 48; *The Urge To Sue,* Time, Nov. 28, 1960, pp. 69, 70. A number of hospitals, for example, are said to have prohibited the use of spinal anesthetics, purportedly reacting to cases adjudicating that physicians employing their facilities were guilty of malpractice because of unfortunate results following the use of such anesthetics. (Silverman, *ibid.*)

[9]When every patient is viewed largely as a potential plaintiff, the method of treatment chosen by the physician may well be that which appears easiest to justify in court rather than that which seems best from a purely medical standpoint. (See *Siverson* v. *Weber, supra,* 57 Cal.2d at p. 839; Rubsamen, *Res Ipsa Loquitur in California Medical Malpractice Law — Expansion of a Doctrine to the Bursting Point* (1962) 14 Stan. L.Rev. 251, 282.) The probable victim of such litigation-oriented medical practice is of course the patient, who suffers first when he receives less than the best available care, and second when the doctor whom he decides to sue understandably appeals to the jury's inclination to protect a physician's professional standing. (See Fleming, *Developments in the English Law of Medical Liability* (1959) 12 Vand.L.Rev. 633, 634.)

[10]See generally 2 Harper and James, Torts (1956) § 19.6, p. 1081; see also *id.,* § 19.5, pp. 1080-1081 & fns. 16-18; § 19.7, p. 1089 & fn. 17; Ehrenzweig, *Compulsory ''Hospital-Accident'' Insurance: A Needed First Step Toward the Displacement of Liability for ''Medical Malprac-*

concept of negligence as a prerequisite to medical liability now provides only sporadic and illusory protection for the physician. At the same time, insistence under all circumstances upon a nominal finding of fault frustrates the risk-shifting purpose of the res ipsa doctrine as currently applied since it stands as an occasionally insuperable obstacle to the financial protection of inexplicably injured patients.

A system openly imposing liability without any pretense of negligence in this narrow range of cases can avoid unwarranted imputations of fault while permitting the rational development of badly needed doctrine. Simultaneously, such a system can insure that the burdens of unexplained accidents will not fall primarily upon the helpless but will be borne instead by those best able to spread their cost among all who benefit from the surgical operations in which these misfortunes occur.[11]

The record in this case supports the conclusion that the plaintiff's arthritic condition resulted from the premature termination of anesthesia, bringing the operation to an untimely halt. We deal here neither with a complication flowing from an undetectable idiosyncrasy of the patient[12] nor with a risk which the patient voluntarily assumed in electing to undergo this type of surgery; we deal instead with a failure of the operation to accomplish the result that the patient, in light of her own physical condition, reasonably expected it to achieve.[13]

---

tice'' (1964) 31 U.Chi.L.Rev. 279, 281-282 & fns. 8-9; Morris, *Res Ipsa Loquitur — Liability Without Fault* (1958) 25 Ins. Counsel J. 97.

[11]See Ehrenzweig, *op. cit. supra, passim*; Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts* (1961) 70 Yale L.J. 499, 548-549; James, *Accident Liability Reconsidered: The Impact of Liability Insurance* (1948) 57 Yale L.J. 549, 550 & fn. 1, 553 & fn. 8; cf. *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63-64 [27 Cal. Rptr. 687, 377 P.2d 897].

[12]As the Chief Justice points out, expert testimony in this case supports the view that a certain number of patients are afflicted with a condition involving an overabundance of myelin surrounding their nerves. This rare condition, known as rachiresistance, apparently cannot be detected in advance and either prevents the deposit of an adequate quantity of the anesthetizing agent on the patient's nerves or accelerates the rate at which the agent disappears. One of the defendants testified that the patient ''had good and profound anesthesia for the prescribed time before she did feel the pain'' and that, for this reason, he concluded that the patient probably ''detoxified faster than normal'' because of rachiresistance. In light of the trial court's instructions and the jury's verdict, the jury evidently rejected this explanation, and I see no basis on which an appellate court could disturb the jury's conclusion in this regard.

[13]I note in this connection that some courts have permitted injured patients to sue for breach of a warranty that surgery would not aggra-

If this failure could have been traced to the anesthetic itself, or to some mechanical inadequacy in the hospital's surgical equipment, the plaintiff would not have been required to establish negligence as a prerequisite to recovery.[14] The wholly fortuitous circumstance that this plaintiff's injury resulted instead from some undetermined mishap in the operating room should make no difference: in neither case should the patient's right to recover turn on her ability to isolate a negligent cause for her surgical injury.

In such situations, the jury should be instructed that, if it finds that the plaintiff was injured in the course of an operation within the collective control of the defendants[15] and that this type of injury rarely occurs in such operations,[16] then it must return a verdict for the plaintiff unless the defendants establish that the injury resulted from an idiosyncrasy of the patient[17] or that the patient knowingly and voluntarily assumed the risk of incurring such an injury.[18]

---

vate their malady. (See Recent Decisions (1962) 37 Notre Dame Law. 725.) The transition from express to implied warranty, and thence to a legally imposed liability without fault, is too familiar to require detailed elucidation here. (See *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 61-63.)

[14]See, e.g., *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57; see also *Bowles* v. *Zimmer Manufacturing Co.* (7th Cir. 1960) 277 F.2d 868, 874 (breach of warranty by manufacturer of surgical pin); cf. Note, *The Medical Profession and Strict Liability for Defective Products —A Limited Extension* (1965) 17 Hastings L.J. 359.

[15]Compare *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258].

[16]Compare *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154. Plaintiffs who suffer from injuries of a type which *commonly* accompany a given medical procedure could of course proceed against defendants on an ordinary negligence theory. (See fn. 19, *infra.*)

[17]Compare Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)* (1966) 50 Minn.L.Rev. 791, 810-811 & fns. 104-106. A doctor who knew or should have learned of the patient's peculiarity might theoretically be held liable if his negligence could be shown to have caused the injury.

[18]Compare *Farber* v. *Olkon* (1953) 40 Cal.2d 503, 511 [254 P.2d 520], in which we concluded that a malpractice plaintiff was not entitled to an instruction on res ipsa loquitur since undisputed testimony established that the bone fractures of which the plaintiff complained constituted "a calculated and even an expected risk of the [electro-shock] treatment." In determining which risks a patient may voluntarily assume in submitting to a given medical procedure, the controlling consideration must of course be the reasonable expectations of the patient arising out of his relationship with the doctor, not the precise language of any prior agreement or understanding. (See *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]; *Darling* v. *Charleston etc. Hospital* (1965) 33 Ill.2d 326 [211 N.E.2d 253]; cf. *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 270-271 [54 Cal.Rptr. 105, 419 P.2d 168].)

Once the elusive and destructive search for an act or omission of "malpractice" has been restricted to those cases in which a negligent cause may actually be demonstrated,[19] a far higher percentage of all medical controversies will be settled out of court, without the "economic and emotional strain of protracted litigation requiring difficult or impossible proof." (Ehrenzweig, *op. cit., supra,* 31 U.Chi.L.Rev. at 288.) In the relatively few cases which reach trial, the imposition of financial liability will not be aggravated by the ruinous consequences of a determination of malpractice unless the evidence points logically to such a finding.

We should not impose the stigma of negligence upon a doctor merely because an operation yields an uncommon and inexplicable result; in the present state of the medical art, the rarity of an event may well bear no relationship to negligence. Courts which ignore that fact in formulating the law of res ipsa loquitur unjustly penalize physicians and plunge the legal process into an abyss of uncertainty and obfuscation. Our proper concern for the financial protection of the patient gives us no warrant for faulting the doctor.

I must conclude that, in this limited category of cases, the attempt to fix liability exclusively in terms of traditional notions of fault has outlived its utility. Once it appears that an unexplained surgical accident has caused an unexpected injury, no useful end is advanced by rehearsing the ancient ritual of assessing blame.

TRAYNOR, C. J.—I concur in the judgment under the compulsion of *Quintal* v. *Laurel Grove Hospital,* 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161], but deem it appropriate to set forth why the evidence in this case, as in *Quintal,* does not justify a res ipsa loquitur instruction.

A physician's duty is to exercise that degree of care and skill ordinarily possessed and exercised by members of his profession under similar circumstances. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757].) He

---

[19]Nothing in this opinion should be construed to suggest a change in the means by which a patient might prove actual negligence or in the defenses which a doctor might properly interpose to a negligence claim. Thus, for example, instructions on res ipsa loquitur would remain available when warranted by the evidence; there would no longer be any justification, however, for giving such instructions simply because rarity and specific acts of negligence might both be present in a given case. (See fn. 2, *supra.*) A verdict predicated upon inferred negligence under a res ipsa instruction would henceforth be sustained only under the conditions set forth in the separate opinion of the Chief Justice.

does not guarantee a cure. The doctrine of res ipsa loquitur cannot properly be invoked to make him an insurer of the recovery of persons he treats. The Latin words cannot obliterate the fact that much of the functioning of the human body remains a mystery to medical science and that risks inherent in a given treatment may occur unexplainably though the treatment is administered skillfully. The occurrence of an injury that is a calculated risk of an approved course of conduct, standing alone, does not permit an inference of negligence.

Such an inference must be based on more than speculation. If it is to be drawn from the happening of an accident, there must be common knowledge or expert testimony that when such an accident occurs, it is more probably than not the result of negligence. (*Siverson* v. *Weber* (1962) 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97]; *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561]; *Cavero* v. *Franklin General Benefit Soc.* (1950) 36 Cal.2d 301, 309 [223 P.2d 471].) A showing that such an accident rarely occurs does not justify an inference of negligence without a further showing that when the rare event happens, it is more likely than not caused by negligence.[1] (*Siverson* v. *Weber, supra*; *Seneris* v. *Haas* (1956) 45 Cal.2d 811, 824-826 [291 P.2d 915, 53 A.L.R.2d 124].)

Nor does evidence of specific acts of negligence justify an inference of negligence based on res ipsa loquitur, for the inferences the jury may reasonably draw from the happening of the accident alone obviously cannot be determined by evidence of the defendant's conduct.

There is no support in the record for a res ipsa loquitur instruction. Two unfortunate events combined to cause the injury, namely, the premature termination of anesthesia and the premature termination of surgery. The former was in the area of Dr. Selmants' responsibility, the latter in Dr. Gibbons'.

Although there is evidence that premature termination of anesthesia is unusual, there is no evidence that when it occurs it is more probably than not caused by negligence. On the contrary, there is a satisfactory medical explanation consistent with due care. There is an inherent risk that a patient

---

[1] "To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks

may have an excessive amount of myelin on his nerves. This condition cannot be detected in advance. It either prevents the deposit of an adequate quantity of the anesthetizing agent on the nerve or accelerates the rate at which it disappears. Physiological and pharmacological evidence indicated that it was such an overabundance of myelin that caused the premature termination of anesthesia in this case.

Accordingly, there is no basis for an inference that premature termination of anesthesia is probably the result of negligence. The hiatus in proof cannot logically be filled by invoking the rarity of the result and specific evidence of negligence. The facts that premature termination is rare, that plaintiff felt that she could not breathe and her voice became squeaky after anesthesia, and that defendants did not discuss the anticipated duration of surgery shed no light on the question whether premature termination of anesthesia is ordinarily caused by negligence.[2]

The record is likewise devoid of any evidence that premature termination of surgery in cases of this kind is ordinarily the result of negligence. Indeed, there is not even evidence that such termination is rare. Although there is evidence that Dr. Gibbons was negligent in failing to consider the relevant factors before making his decision to terminate the operation, such evidence of specific negligence sheds no light on the inferences that may be drawn from the happening of the accident itself.

The absence of any basis for invoking res ipsa loquitur against either defendant individually also forecloses invoking it against them jointly under *Ybarra* v. *Spangard* (1945) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]. The *Ybarra* case involved an accident that was clearly the result of someone's negligence, and the court imposed a burden of explanation upon all the defendants who had assumed control of the unconscious plaintiff. That case cannot reasonably be invoked when the accident itself affords no evidence of negligence.

---

are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which defendant is not responsible.'' (*Siverson* v. *Weber*, *supra*, 57 Cal.2d 834, 839.)

[2] The majority opinion mentions that Dr. Selmants did not note in his operative report that the surgery was not completed, and that Dr. Gibbons charged plaintiff less than his usual fee and his partner offered to fuse the ankle for a token fee. Whatever remote relevance these facts might have, they add nothing to a determination of the inferences that may reasonably be drawn from the happening of the injury alone.

The expansion of res ipsa loquitur undertaken in *Quintal* places too great a burden on the medical profession and may result in an undesirable limitation on the use of procedures involving inherent risks of injury even when due care is used. (*Siverson* v. *Weber, supra,* 57 Cal.2d 834.) An anesthesiologist and a surgeon, confronted with one of the inherent risks of an operation not susceptible to advance calculation, may be found liable for any unfortunate consequence. In planning a course of action they may therefore feel compelled to consider not simply the best interests of the patient but the procedure that will be most readily justified to a lay jury.

The essence of *Quintal* is restated in the majority opinion, which first discredits rarity alone as a basis for res ipsa, but then states: "The likelihood of a negligent cause is increased if the low incidence of accidents when due care is used is combined with proof of specific acts of negligence of a type which would have caused the occurrence complained of. When these two facts are proved, the likelihood of a negligent cause may be sufficiently great that the jury may properly conclude that the accident was more probably than not the result of someone's negligence." That statement might be appropriate for counsel to make in arguing to the jury that it could infer from evidence of defendants' negligent conduct that such conduct caused the injury. It has no relation, however, to res ipsa loquitur, which involves the inferences that may be drawn from the mere happening of the accident.

McCOMB, J.—I dissent. I would reverse the judgment for the reasons expressed by Mr. Presiding Justice Pierce in the opinion prepared by him for the Court of Appeal in *Clark* v. *Gibbons* (Cal.App.) 50 Cal.Rptr. 127.

Appellants' petitions for a rehearing were denied May 17, 1967. Traynor, J., and McComb, J., were of the opinion that the petitions should be granted.